Good morning. May it please the court, counsel, and Mr. McCracken if and when he's able to listen to this. Your Honor, Your Honors, So Mr. McCracken's listening, you said? I don't know whether or not he is. I've asked him if he would be able to. He's in prison. I doubt if he is. But at some point I hope that he will be able to, and I hope that that's soon. In preparation for this argument, I seem to have gotten stuck on the September 28th hearing and its impact as September 28th of 2012. Because it was at that hearing that I think the first set of issues as to withdrawal of counsel, counsel of choice, and representation pro se are all presented to the court. Well, let me have you when you're addressing this. I didn't just fall off the turnip truck. And I was a trial judge and a trial lawyer. And I have had experiences with defendants similar to Mr. McCracken. And they are a trial court's nightmare in the sense that they, I mean, on the one hand, they can be extremely manipulative in terms of when they're equivocal about bringing things up. They know how to fling out, I want to represent myself, but no, I don't. I want another lawyer, but no, I don't have one here. And it always usually happens. And then, of course, then what we call in the state court Marsden issues, they're not letting me run the case, all of those things. So you have it all encapsulated in this. And you have a trial judge trying to march towards trial. And it always happens on the eve of trial. And there's never anyone there, there's never a lawyer there that says, yes, I'm going to take over the case, I've been retained by the family, and I can be ready to go on a certain day. So you have all of those issues going on. And plus the state, well, the government also has a right to go to trial within a certain period of time. So why is this so unequivocal in that Mr. McCracken goes back and forth and he keeps, you know, and then when he's pressed he says, well, no, I don't really want to represent myself. Or, oh, what does it mean if you be standby counsel? No, I don't have a lawyer here, but I would like someone else. This is not an easy defendant. Well, Mr. McCracken does not have an easy life and he does not have an easy set of presenting mental abilities. I think the best answer to that, and I did anticipate this question, although not as forcefully or as well put. Well, I'm just trying to, what to do with Mr. McCracken and how does someone, that obviously the district judge got a little lively with him and there was, got a little irritated with him. And I think that that's the key to the answer to your question is the totality of the circumstances, prevailing Ninth Circuit law as to the duty of the court to make inquiry when those issues are presented, whether it's with a difficult client, somebody who has mental challenges as does Mr. McCracken, and the obligations under Adelso-Gonzalez and its progeny are quite clear that the court cannot engage in the type of at least ab initio colloquy that it did when McCracken was. But what should the district court have done? Well, I think. I mean, he listened to him. He considered everything that he had to say. And he, you know, unfortunately expressed some irritation with Mr. McCracken. But he expressed that frustration early on. And I think that. But what, under our case law, what is it that the district court failed to do? I think that the district court failed to engage in an inquiry of Mr. McCracken to determine the nature and extent of the conflict that he was having with his appointed counsel and the circumstances that are most compelling for Mr. McCracken. Well, you get, if you, you know, if you read the transcript, you get the feeling that Mr. McCracken had a certain defenses that he wanted to raise. Mr. Johnston didn't think they were viable. And they were, you know, the district judge heard that all, heard all of that. Your Honor, you're right. But the context within which that happened is there was a competency proceeding that was earlier that month, September 8th. There was a delayed competency order that wasn't entered until 10 days before that hearing. That hearing was four days before commencement of trial and the day after the significant attorney-client conference between Mr. Johnston, his appointed counsel, and Mr. McCracken. McCracken had a laundry list of concerns and issues that he wanted to articulate to Judge Layton in furtherance of either representing himself, having an opportunity to hire private counsel, which he couldn't do before the completion of the competency hearing. But did a private counsel ever show up and say, I'm ready to go, or I need to, you know, I've been retained by the family, I want to represent him, and I need two weeks, I need 30 days, I need whatever? As far as I can tell in the record, that's just, it's all kind of a hypothetical speculative discussion. I would like to hire someone, but I don't see anyone out there. Your Honor, I think that the best answer to that is Mr. Johnston's motion. His written motion to the court, which was filed on the 27th of September, the day before the hearing, was quite clear and direct. What appointed counsel said is in his declaration, his declaration in support of the motion, McCracken wants a new attorney or he wants to represent himself. There was no indication that he wanted to hire counsel. The very first page of the transcript, Volume 1 of that September 28th hearing, after the introduction by the court, Mr. Johnston says to Judge Layton, he wants a new attorney or he wants to represent himself. We submit that that triggers the type of inquiry that Farias and Adelzo Gonzalez set forth as a requirement. And the first thing that the judge says to McCracken is, you're getting to be a pain in the ass. That's the first thing that he says to this man who has mental challenges, was just found confident 10 days before, had been in custody for 15 months waiting for trial, had by his expressed concern, lost faith and confidence in his lawyer, his appointed attorney who he thought was not prepared for trial, Johnston himself in that hearing says, we're a little bit behind the ball, and blames it on McCracken for telling McCracken's mother not to provide witnesses to Johnston after the competency determination 10 days before. Well, but that can cut against McCracken, too, that his mother, that he's not cooperating, that he's causing part of the delay. And I think also some of the people that testified to his competence seem to find that he is pretty high on the manipulative scale. I mean, I always get concerned about Ferretta, but we've got the court directly asking him, do you want to represent yourself? No, I want to hire Jeffrey Steinborn. The court indicated that he could not do so because it would cause delay. Then the court asked, what's going to be different with another lawyer? Johnston replied, nothing. Johnston elaborated that if McCracken thought he knew the law better than Johnston, he could grow some, quote, unquote, frigging stones and represent himself. The court responded, well put. McCracken again referred to 12 lawyers who claimed they agreed with his analysis. The court explained, I know most of them, and they wouldn't believe this line of, quote, unquote, bull that we're here to listen to. Then the court asked again, do you want to represent yourself? McCracken answered, no, I don't want to. I want Jeffrey Steinborn to represent me. And then we go through this whole thing, and then the end of it, when the court said this is over, Mr. Johnston, you are going to represent him, the defendant, no, I will. The court, you're going to represent him. Mr. Johnston, if he changes his mind, the motion's denied. If I can represent myself because he doesn't listen to my, and then blank, if the day of trial he changes his mind, I will let you know, says Mr. Johnston. The court says, yeah. So, I mean, it's, he says no when he gets pushed, and then he backs off, and then there seems to be, and then I guess he wanted to, what, he wanted to cross-examine the chemist too? On the second day of trial, the court, at the end of that day, said that he wanted to selectively represent himself. That doesn't appear anywhere of record until the court makes that comment. The court, Your Honor, was very, very good in summarizing those concerns. What it was is that Mr. McCracken was trying to explain to the court that his first preference was to retain private counsel, Jeffrey Steinborn. But he hadn't actually retained, at that moment, he had not hired. That's correct, Your Honor. And he was free to do so any time, right? I mean, he didn't have to ask the court's permission to hire private counsel, did he? He might have to ask the court's permission for a continuance, but he doesn't have to, he doesn't have to, he can, he can fire Johnston whenever he wants. Can't he? We had this crushing rush to start trial. The march had accelerated. Counsel said, can he fire Johnston at will? He could have retained counsel prior to the September 28th hearing. So when he comes in and says, I want to hire Jeffrey Steinborn, that's his own business. He's telling the court what he wants to do, but he can do that any time. And if he is unable to do that, he wants to represent himself. And on the very last page of the transcript, the reference quoted by the government brief is out of context. It was quoted by Your Honor here this morning, and what he said, what McCracken says, after it becomes clear that he's not going to have an opportunity to retain counsel at this point, the court is not going to appoint substitute counsel for the court's friend, Johnston, who the court had endorsed, vouched for earlier, talked about what a great lawyer he was, how he was a personal friend, how they knew each other from athletics, and in the courtroom, and in the community, and how at the time of the substitution hearing, months before, it's clearer, the colloquy is not between the court and McCracken. It's between the court and Johnston. And what McCracken says at the very last page of Volume I of the transcript at the end of the hearing is, I will, and then there's talking over by both the court and appointed counsel, I will, if I can, in other words, if the court permits me to, represent myself. Again, a very clear direction that should have triggered a Feretta inquiry. Well, but there was a Feretta inquiry, and then when he would start to say, well, do you want to represent yourself? I think you'd be crazy if you do it, but you, and then he goes, no, I don't want to. Then he would, when he was really pushed, he would say, no, he didn't want to represent himself. But then he would flip these things back in when, then he wanted the taxpayers to pay for a lawyer, a lawyer of his choice, and the court clearly told him, no, the taxpayers are broke, they're not going to pay for it. You go ahead and get it yourself, and he never does. Well, that's a different issue. I know, but they're all, it's hard to, they all keep coming up in the same conversation. And so when we talk about whether there's something is unequivocal or whether it's equivocal, we have to consider the totality. And he's part of the equivocation here. I submit that there is not the type of equivocation on the record which would dispense with the type of inquiry that the Ninth Circuit wants district courts to undertake with defendants. What Adelzo Gonzalez says is, such inquiry as might ease a defendant's dissatisfaction, distrust, and concern. So what questions should the district court have asked? I think it should have inquired further as to the basis for McCracken's concerns about the lack of preparation, about the lack of consultation, which is why he asked that his mother not provide witnesses until Johnston came and visited him. But Johnston discussed potential defenses, including defenses that McCracken wanted him to do, and explained before the judge and McCracken why he thought those defenses were not viable, what the law was. And he seemed to show great confidence in all of this. So what further inquiry should the district court have issued here? McCracken's serving a sentence of 14 years. We're talking about what transpired days before trial after 15 months of imprisonment. That's the totality of the circumstances. We're talking about a man who has been diagnosed for most of his life, starting as a teenager, as a paranoid schizophrenic, with competing questions as to his mental incompetence to proceed that are resolved by the court 10 days before this hearing. So why is there this fast march to trial? Why is it that McCracken cannot be calmly and reasonably inquired of to the court as to why he's concerned about not having visitation with Johnston? Why is it that he says that Johnston isn't writing him? One of the factors that the court looks at is communication. When McCracken says to Judge Layden, I've written you letters, the response is, I'm not your pen pal. It's not the type of proceeding. And I can appreciate what Your Honor Judge Callahan is saying about district court level trial court problems. McCracken was given Johnston. He didn't ask for a report in counsel. He didn't fill out a financial affidavit. The court assumed that he was impecunious. There was never any inquiry about whether or not he needed it. But what should the court have done? I mean, if the court came forward voluntarily and provided him a lawyer, and you're telling us that that wasn't necessary, that sounds like that was really nice of the court. And McCracken is, again, free, if he has his own resources, to hire his own lawyer at any time without asking the court's permission. And he would do so. I'm sorry. I think that that's why the timing of the sequent of events, particularly the resolution of the competency issue, so close to this trial date, what the court probably should have done is immediately inquired of the co-defendant whether or not he was going to ask for a severance. Because he did. That would have resolved the court's big concern about starting the trial on October 3, just a couple of working days after this hearing, which was based upon the first meaningful attorney-client contact that had ever happened between counsel and counsel. I'd hope to reserve five minutes. I have 13 seconds left. I'll give you a minute to worry about it. Thank you. Thank you, counsel. Thank you. Good morning, Your Honors, and may it please counsel, may it please the court. The adequacy of the inquiry is the focus of most of the defense brief in this case and most of the panel's questioning in this case. I do believe that the district court in this case quickly came to the determination of what is the issue here. The issue between Mr. Johnston and Mr. McCracken was one of what defenses were going to be presented at trial. Mr. McCracken states the district court's remarks didn't give me a lot of comfort. And I presume, Your Honors, referring to the initial remarks. He was very irritated with McCracken. He was. Well, and, again, we don't have the context of what was actually going on in the courtroom. We don't know what movements or anything that Mr. McCracken might have done. That's true. But we do know that Mr. McCracken or Mr. Judge Layton allowed Mr. McCracken to speak to, he asked him both direct questions and open-ended questions. And the record shows that he did get at the heart of the dispute between Johnston and McCracken, which was what defenses to present at trial, how to conduct his defense at trial. Well, except, I guess, all of it. You can't, it's really hard, you probably both want to make everything really discreet. But one all flows into the other in this. And anyone that's been in a trial court understands how they all flow into the other. Because first you have his competency, and then essentially then you have issues about he's unhappy with the lawyer and they go into is it the nature of the lawyer that he's not doing things, is he incompetent, is he entitled to a new lawyer. And then interspersed in all this, well, I'll represent myself. Or I want to hire someone else. Well, can't you get me someone else? And then he does make some, it's, the trial judge, would it really have been that unreasonable for, was it that unreasonable for Mr. McCracken to postpone requesting alternate counsel until after he was found competent? I mean, it's, you know, because we're jamming him because it's on the eve of trial that he's asking all these things and then saying, no, we can't have a delay. But his point is, he says, well, I had to get through that competency before I could really get to that issue. Is that unreasonable? Well, I think what the record shows is Mr. McCracken was seeking counsel after John Henry Brown was excused from the case. He indicates that he interviewed 12 lawyers and none of them were willing to work for him. Either Mr. McCracken didn't have the money or I think they showed what the real dispute would have been with any lawyer, even if Judge Layton did replace the trial counsel, is Mr. McCracken wanted to present four affirmative defenses. He says there's about four affirmative defenses in trying to negate one of the elements of the defense. So I think that when the district court says this would be the same with any defense, the timing is important, but it's not that important. It shows that the issues would be the same. Mr. Johnston was prepared to conduct the trial. He indicated that he contacted a witness. He was prepared to present a duress defense. He didn't, in fact, get that witness out. That witness testified in Mr. McCracken's – on Mr. McCracken's behalf about duress. And he indicated, again, at the very end, both at the beginning of the September 28th hearing and at the end of the September 28th hearing, that he was prepared for trial. Did Judge Layton ever ask the government that the government was willing to agree to an extension? The government wasn't present at this hearing. I know. I guess I'm asking outside of that, I mean, or before, or at any time. I don't believe there was any discussion of the trial date. With the government? At the June 20th hearing, we – the indication was that we're going to keep the October 3rd trial date. That was the idea. The trial was set, I think, at that point for October 3rd. But then it was never – I don't recall anything being discussed about moving the trial date. I mean, by that point – And was his co-defendant insisting on going to trial? The co-defendant had not waived speedy trial. At that point, speedy trial had been continued just because of Mr. McCracken's competency hearing. The government had been planning, had witnesses under subpoena and plans to transport them up or have arrangements for them to come up from Vancouver and Kelso, southwestern Washington, to Tacoma for the trial. So the trial was in process. And Mr. Ness, on behalf of Mr. Ramirez-Lucio, had not moved for a motion to sever. In fact, the record, as I read it, he doesn't move to sever until after Mr. McCracken testifies. I believe that district court actually is correct in here when the district court says, Mr. Ramirez-Lucio's trial strategy is to make you appear the fool and sort of appear quietly during trial. So – but I do think, again, when it comes to the timeliness issue, the fact that there is a co-defendant here is a reason why the district court was not inclined to – I think that factored in the district court's timeliness inquiry. Well, if the district court was annoyed with him, and I'm not saying without a basis for that, but is it – would you concede that a district court could get so that it would be impossible for a defendant – I'm not saying here, but under some circumstances, if the conduct by the district court were so extreme that a defendant's right to represent himself or alternate counsel, that you wouldn't – really don't get to the bottom of it, that a court could be so intent on hushing someone up? And there's clearly a struggle between the district court and Mr. McCracken as to who's going to control the court proceedings. Well put, Your Honor. I do think that's – I do think there could be that situation. I don't think this is the situation here. The judge had given Mr. McCracken's colorfulness and his – you know, he's clearly thought a lot about his case, and he had a lot of different views about the case. And Judge Layton did try to help. He was trying to help, I think, Mr. McCracken see it's a fool's errand not only to inconsistent with each other. And he got to that – he let Mr. Johnson explain why this was not a good idea. And I think you can tell that by October 3rd, where they have a brief off the record. Is that part of a FRERETA inquiry, telling a defendant why it would be foolish to do certain things? Yes. That is the – Judge Layton's FRERETA inquiry would be, you don't know the rules of evidence, you're not a trained lawyer, the government is not going to help you, I cannot help you. Those sorts of comments were touched upon. But I think when it comes to the right to self-representation, this was never – Mr. McCracken didn't ask to go, per se. And I think given the fact that there are three counsel issues emanating from one hearing, it makes it clear that he did not clearly ask to go, per se. How long did – how much time was spent with Mr. McCracken? Is there a way to ascertain from when? Okay, it starts with his complaints about Counsel Johnson. Then it morphs into, can I have other representation, I'm going to hire other – how much time was spent? It starts, I think, on the 28th, he said, and then it continues on. How much time was spent by the district court? Court time, yeah. How much court time going through these? Because I see there's the, should Johnson have stayed on? Should he have gotten another – should he have gotten another counsel? Should he have been given a continuance to go out and hire someone? And should he have represented himself? All of those issues. How many hearings were there on that, when you consider all of that? There were two hearings. There was the hearing on September 28th, 2012, and then there is a brief hearing the morning of trial on October 3rd, 2014. But then there are other hearings touching on Mr. McCracken's right to counsel in May and in June when John Henry Brown, his first counsel, withdrew. So those hearings – Because that was because of the conflict of Billy Mack? Yes, that was the conflict of interest with Mr. Brown. Mr. McCracken never really seemed to understand why Brown was forced to withdraw. At the time, there's no comment that indicated he had a clear understanding. I think certainly by September 28th, 2012, when he's making this argument and this argument and this argument, he understands why he had to withdraw. And I do think also when Judge Layton inquired of Mr. McCracken at the first hearing, May 19th, 2012, that's when Mr. McCracken said, I know my defense in this case is to go after Billy Mack and to make him – is to go after him with everything I have. And so, again, whether Judge Layton asked the next question to say, do you understand why he can't be on your case, I think Mr. McCracken, if not then, he knew why John Henry Brown had to withdraw. But there was only one real hearing on the – it was the September 28th hearing about his desire to replace Johnston. Yes. That's the hearing that addressed – but by that time, he had never retained counsel. It actually was Johnston that raised the issue. He said, you don't want to withdraw. I want out of this. Let me out. It is. It is. It's a – it is the only hearing. It is the hearing. And, again, it's one of those free-flowing hearings, like Your Honor said, that flows from issue. I wanted to retain counsel. Mr. McCracken was frustrated because no one would work for him, either because he didn't have the money or they thought his case was too, as they probably nicely said to him, complex. No one would work for him. He was upset because John Henry Brown had withdrawn from his case. He was upset because Mr. McCracken – or Mr. Johnston wouldn't present his inconsistent affirmative defenses. And he was upset because the – his trial date was coming, and he was upset that he didn't – that the evidence was probably – the evidence was very good against him. So he was upset about a lot of different things. Well, and the court kind of told him something to the effect of get off the cross, we need the woods, stop thinking of yourself as a victim suffering, something along those lines. The defense – again, the court controlled the courtroom, is what the court needed to do to direct the inquiry. And again, I think under this Court's precedent, the adequate – this is not an inadequate inquiry. The court got to the heart of the problem, and it was – it was the problem Mr. McCracken had had with other lawyers that he tried to – the 12 lawyers that he had contacted before. He indicated he had the same problem with John Henry Brown. He had the problem with Charles Johnston. He would have the problem with the next lawyer. He wanted to present a number of – he wanted to present four affirmative defenses to a methamphetamine conspiracy in possession with intent to destroy the case. So in order – in order for Johnston to – so Johnston initiated the whole thing, right? Yes, Your Honor. So he's asking for leave to withdraw. Yes. Right? So he had to give a good reason. He had to show good cause to withdraw. Yes. And I gather the bottom line is the court didn't find there was good cause. Yes. He – I think the court said this would be the same. I see that the conflict between you two is a trial strategy conflict.  attorney. That is not a sufficient reason to withdraw. And I put it differently. He also didn't find an irretrievable breakdown in relationship. And I think, yes, Your Honor, and I think Mr. Johnston said that at first, that they were getting along. They were – they got along with each other. They were able to talk about those issues. Mr. Johnston heard the defenses that he wanted to – Mr. McCracken wanted to raise. He just didn't think they were a good idea. Now, what if Mr. Cracken had said, I'm not working with that guy? I don't want to see him. I'm not going to cooperate with him. I don't want him. I don't like him. That's a different case. Again, I think the district court would probably have conducted a different inquiry then to get at the heart of why aren't you two communicating. But, again, because of Mr. Johnston's representations and because of this case, the district court could tell that they were communicating. Well, but if Mr. McCracken completely withdrew, hypothetically, which is not what the facts are, but if he completely said, I'm not talking to him or I'm not doing anything, a court would be in a position to say, hey, look, this is your problem. There's nothing wrong with your lawyer, but if you – you know, I can't make you talk. I can't make you come into the courtroom. I can't make you do any of these things, and if you do it, this is what's going to happen to you. And, I mean, you can do that, can't you? But that's not what happened here. Yes, that's not what happened here. The court focused on the problem here, which was the idea of the multiple defenses. And, again, the idea of representing himself was pointedly put to Mr. McCracken a number of times by the district court, and he said no. The answer was no. And, again, based on this court's precedent, the right to self-representation must be unequivocally invoked, and it wasn't here. He was very – well, actually, he was very clear. It was basically your point, and that there could be a clearer record in a case, but given Mr. McCracken, that this was the best that anyone could ever do with him, and that's what we're stuck with, and the appellant's position is, well, even if Mr. McCracken is difficult or whatever, you've got to do better. Yes. I mean, isn't that sort of what we're here for? Yes, Your Honor. I think as Your Honor indicated at the outset, a trial court has defendants like this from time to time that are difficult, that have – that bring these motions that seem to request everything. Of course, a defendant who wants to present four affirmative defenses is going to want new, is going to want to retain his own counsel, but he doesn't have the money. He's going to want to appoint another counsel, but there's no reason to, and he's going to want to indicate sort of touch and step back and touch and step back from the idea of representing himself. He never invoked the right to represent himself. Well, Beretta's a structural error, correct? If he were denied the right to represent counsel, he would – that would be a structural error. Yes. To represent himself, but that is nothing – again, he doesn't get there. He says no. He says no. The counsel quoted the very end of the transcript on the September 28th hearing, and after the court says this is over, makes his ruling, then the defendant jumps up or says no, I will. The court says you're going to represent him. Mr. Johnson says if he changes. The court says the motion is denied. Then the defendant says if I can represent myself because he doesn't listen to my. That is exactly the sort of impulsive statement that does not count. This is not – this court will not recognize it. invoking the right to counsel or invoking – waiving the right to counsel, invoking the right to self-representation. It was not done in this case. Okay, thank you, counsel. Thank you. Although McCracken referenced four defenses, what he really wanted was to have a lawyer that paid attention to him and his case and appreciated his concerns and his issues and what he thought was important going forward. That did not happen. That's why he was asking in the alternative for either different appointed counsel, the ability and time to hire his own counsel as his first preference, or to represent himself if the court wouldn't permit that. When you're talking about the denigration of McCracken's appearance before the court, think about what his primary defense going forward was at the time of trial. It was, this is not methamphetamine. My intention was to convert it to MDMA, methyl dioxide methamphetamine. And there was evidence of that. There was testimony about that. That's why he wanted – McCracken wanted to cross-examine the government's witness. During the trial, what Johnston says is, I'll have a cram course on chemistry. Johnston told the judge, this is a simple, at the hearing on McCracken's concerns, this is a simple case. How would it help him that he puts himself forth as being a chemist on drugs in a drug case? Well, by the record, that it was a different substance than what he was charged with, that he didn't have the intent that he was charged with. The guidelines would have called for much, much more lenient treatment if it was MDMA and not methamphetamine. It would have been a totally different case. He needed a lawyer to appreciate that, not a lawyer. Strategically, with a jury, that doesn't really sound very good. When you're a defendant looking at what turned out to be 14 years imprisonment, I would hope that you in the system would either have the ability to have a lawyer who represents you, not somebody who tells the judge, this is a simple case and I can try it in three days and I already am talking to one witness. That's a seat of the pants. That's what had McCracken so concerned. He was never rude or abusive to Johnston or the court. His concerns, Johnston doesn't answer his phone. Johnston admitted that, said that he was a pain in the ass. He doesn't read my brief. Johnston said, I thought it was a waste of time. I had more important things to do. McCracken said, I never got any mail from this man, nothing. I never got my discovery. He never came and visited me. And when he did, it was to talk about airplanes, except for the day before the September 28th hearing, less than a week before the commencement of trial. That's why McCracken was concerned. Thank you. Thank you, Your Honor.
judges: Paez, Bybee, Callahan